(93 South. 121)

No. 24205.

JACOB et al. v. REYNAUD.

(June 30, 1921. On Rehearing, June 30, 1922.)

*(Syllabus by Editorial Staff.)*

1. Receivers ☞128—Debts assumed in purchasing property held secured by vendor's privilege and superior to receiver's certificates.

Debts assumed by a corporation as part of the purchase price of a plantation were secured by a vendor's privilege within Act No. 199 of 1914, subordinating receiver's certificates to vendor's privileges.

152 LA.—12

2. Corporations ☞560(5) — Purchase of treasury stock by receiver held a nullity.

Under Civ. Code, arts. 1146, 1790, relative to purchases by fiduciaries, and articles 1765 and 1798, making the meeting of two minds essential to a contract, a sale of unissued treasury stock to the corporation's receiver in consideration of his advances of operating expenses was a nullity.

3. Corporations ☞560(5)—Sale of treasury stock to receiver not validated by action of board of directors.

A resolution of a corporate board of directors pending a receivership authorizing a transfer of treasury stock to the receiver in consideration of advances to be made by him for operating expenses was a mere formality not validating the transfer, since the power to dispose of the corporation's property is in the receiver, and not in the board of directors.

4. Corporations ☞560(5)—Receiver must make out strong case to sustain transaction whereby he becomes owner of half of corporate property.

In view of Civ. Code, art. 1146, prohibiting fiduciaries from acquiring property intrusted to their administration, a receiver must make out a strong case to sustain a transaction whereby he becomes the owner of an entire half of the property intrusted to his administration, especially where the prospects of the property becoming valuable had brightened between the time of his taking charge and the time of his acquisition.

5. Corporations ☞560(5)—Receiver making advances not limited to legal interest in determining whether equivalent was given for treasury and other stock transferred to him.

In determining whether advances made by a corporate receiver for operating expenses constituted a full equivalent for treasury and other stock transferred to him, the full value of the money advanced and the value to the company of the risk he was taking in advancing the money should be considered, though the value of the money was greater than the interest allowed by law, in the absence of express agreement.

6. Receivers ☞196—Commissions in addition to interest on moneys advanced held usury.

A corporate receiver, making advances for operating expenses, could not charge commissions in addition to interest, as such commissions would constitute usury.

**7. Corporations ☞560(5)—Receiver's performance of duty not sufficient consideration for transfer of treasury stock to him.**

A corporate receiver, in obtaining an advantageous contract for the grinding of the corporation's sugar cane, did no more than his duty, and his performance of his duty in this and other respects, though constituting an extrazealous performance of duty, did not warrant a transfer of treasury stock to him.

**8. Corporations ☞560(5)—Agreement held not to relieve receiver of obligation to procure advances for operating expenses before requiring transfer of property for advances by him.**

Though, when a receiver was appointed for a corporation, it was understood between him and the vice principal and active manager who represented the other stockholders that the receiver was not to be expected to procure advances with which to operate the corporation's plantation, such agreement did not relieve him of his duty as receiver to use every endeavor to secure such advances before requiring the transfer to him of one-half of the property of the receivership in consideration of such advances by him.

**9. Corporations ☞560(7)—Suit to set aside transfer of treasury stock to receiver not based on lesion beyond moiety.**

A suit to set aside a transfer of corporate treasury stock to the corporation's receiver in consideration of advances made by him with which to operate the corporation's plantation is based on the nullity resulting from the relation of trust, and not as claimed on mere lesion beyond moiety.

#### On Rehearing.

**10. Corporations ☞111—Stock is property of stockholders, and may be sold as they see fit.**

Stock in a corporation belonging to individual stockholders is their property as distinguished from the tangible assets of the corporation, and they may sell, transfer, or deal with it as they see fit.

**11. Corporations ☞560(5)—Sale by stockholders to receiver voidable and not void.**

Transfer of stock in a corporation to the corporate receiver by the individual stockholders in consideration of advances made by the receiver with which to operate the corporation's plantation was voidable and not void.

**12. Corporations ☞560(5) — Stockholders held estopped to avoid transfer of their stock to receiver.**

Where stockholders in a corporation transferred stock to its receiver in consideration of his agreement to finance the operation of the corporation's properties and of his valuable services, and continued to receive the benefits arising therefrom for two years, during which the corporation from a condition of practical insolvency was converted into a healthy going concern, though advised of the limitations imposed on the receiver as such, they cannot avoid the contract.

Provosty, C. J., dissenting in part; Land, O'Niell, and St. Paul, JJ., dissenting.

Appeal from Twenty-Seventh Judicial District Court, Parish of St. James; Philip H. Gilbert, Judge.

Suit by Jules J. Jacob and others against Firmin Reynaud. From a judgment for defendant, plaintiffs appeal. Judgment set aside, and judgment rendered for plaintiffs for part of the relief asked on rehearing.

See, also, 144 La. 1006, 81 South. 604; 146 La. 400, 83 South. 688.

Charles Louque, of New Orleans, and Howell, Wortham & Le Bourgeois, of Convent, for appellants.

Guion & Lambremont and Henry L. Himel, all of Convent, and Dart, Kernan & Dart, of New Orleans, for appellee.

By the WHOLE COURT.

PROVOSTY, J. While defendant was the receiver of the plaintiff company, all the shares of stock of the company remaining unissued (680 shares of $100 each) were issued to him, and 70 shares already issued were transferred to him, in consideration of his undertaking to make advances of money to the company for enabling it to operate its plantation; and this suit is by the other stockholders of the company and by the company itself to have this issuance and transfer of stock set aside on the ground that the relation of trust in which defendant stood towards the company and its stock-

holders precluded him from thus acquiring said shares of stock.

The history of the matter has already been told in part in the case entitled Jacob v. Uncle Sam Planting & Mfg. Co., reported at page 1006 of 144 La., 81 South. 604.

It begins with the disastrous ending of the crop year 1913, when, owing to the deficiency of saccharine in the cane and the low price of sugar, the plaintiff company found itself unable to meet its obligations. On January 15, 1914, it addressed a circular letter to its creditors, informing them of the situation, and suggesting that only by continuing to operate the plantation could it hope to be able to pay their claims, and that as yet it had not been able to secure the financial assistance necessary for thus operating. One of these creditors was the law firm of Guion, Lambremont & Hebert, the defendant's counsel in this case, for a fee due them for having represented the company in a damage suit. In answer to this circular Mr. Lambremont, in a letter, dated January 17, 1914, addressed to Jules Jacob, Jr., and beginning "My dear Jules," and ending, "With kindest regards, Very Sincerely Yours, P. M. Lambremont," wrote:

"Upon my return from New Orleans, last night, I was handed the circular letter of the Uncle Sam Planting & Mfg. Co. addressed to our firm, as one of its creditors. I regret to learn of the financial embarrassment of the company you represent.

"If you can conveniently do so, I wish you would come to my office this morning and let us talk over your troubles and see whether or not we can devise some means by which we can bridge over your difficulties.

"Speaking for myself individually, and for the firm of which I am a member, I wish you to know that we are your friends, and will do our utmost to render you any assistance within our power."

Jules Jacob, Jr., was a stockholder and vice president of the company and the active manager of its affairs; the other stockholders being his two sisters and his old father, who died about a year later, who was president. In response to the invitation contained in this letter, Jules Jacob, Jr., went to the law office of Mr. Lambremont, and was there persuaded by Mr. Lambremont to have recourse to a receivership, although other lawyers whom he had consulted had advised differently.

The corporation had then been in existence one year. The object of its organization had been to own, cultivate, and operate the Uncle Sam plantation, with its factory and appurtenances, which was situated in the parish of St. James, and belonged to the organizers, Jules Jacob, Sr., and his son and two daughters. The capital stock was fixed at what was the estimated value of the plantation, $150,000, and the plantation was sold to the company at that price. The stock was divided in shares of $100 each. Of these, 322 were issued to Jules Jacob, Sr., 182 to Jules Jacob, Jr., and 158 to each of the daughters, Miss Marie Jacob and Mrs. Edith Jumonville. The remaining 680 shares were retained in the treasury of the company, for the reason that a mortgage of $68,000 rested upon the property, the payment of which the company had assumed as part of the purchase price of the property.

Mr. Lambremont testified as follows:

"Mr. Jacob discussed with me, upon his visit to the office, his financial embarrassment. He stated to me how much he appreciated my offer to help him, and asked me what I thought could be done. He stated that he had consulted attorneys in New Orleans, and, among others, if my memory serves me correctly, the firm of Dart, Kernan & Dart; that he had received no encouragement; that he had offered (meaning himself and his father) to turn over the Uncle Sam plantation to Mr. Levert. the mortgage creditor, if Mr. Levert would pay the ordinary creditors; that all that he was after was to liquidate the debts and have no judgments recorded against the company; that Mr. Levert had turned down the proposition and had refused to take the plantation in payment of the debt owed him and to pay the ordinary creditors. We discussed very fully the financial condition of the Uncle Sam Plant-

ing & Manufacturing Company. I told Mr. Jacob that, according to my best judgment, I could see but one thing left for him to do, and that was to place the property of the corporation in the hands of a receiver; that, while it was true prospects were very gloomy, time might do everything; that if he could be successful in having a receiver appointed it would have, at least, the effect of staving off his creditors and something might turn up meanwhile; that conditions might change and he might be able to save something out of the wreck. I also told him that, of course, in my judgment, it would be necessary for him to have a man appointed as receiver who had a reputation as a successful business man, a man of standing and ability, a man who could make a success of the venture, and some one who would command the respect and confidence of the creditors. Such a man was discussed, and I suggested to Mr. Jacob that I thought Mr. Reynaud would be an ideal man for the receivership if he would accept it. He took very kindly to my suggestion, and told me that he would discuss it with his father. Mr. Jacob returned to the office the next day, and told me that he had consulted his father; and that they had come to the conclusion that my advice was sound, and that it was proper to follow it. In so far as consulting me, or the firm, as attorneys, such a thing was never mentioned. There was no impression left on his mind that the conference was anything more or less than one close friend going to the assistance of another friend in distress."

Mr. Firmin Reynaud was a planter, merchant, and banker of the neighborhood, owner of several plantations and president of two banks, commanding general confidence, of high standing financially and in every other way. He was at first reluctant to accept the position; but finally consented to do so at the insistence of the Jacobs. He testifies that he made it an express condition that he should not be required to procure the advances of money necessary for running the plantation. At what date he was thus prevailed upon the record does not show. The application for the receivership was filed on March 5, 1914. Some difficulty was experienced in procuring some creditor to make the application. Miss Adele Jacob did so, at the request of the Jacobs. The company owed her a balance on the rent of her St. Michael plantation for the year 1913 leased to the company.

In the meantime, the firm of Le Bourgeois & Bush, of New Orleans, had consented to make the necessary advances for operating the plantation in the year 1914; and had already paid the taxes of the year 1913 on the plantation, and furnished the money for one pay roll.

The ground of the application for the receivership was that the company was unable to meet its obligations as they matured. The company by formal resolution consented to the appointment. An inventory of the property of the company was made which showed a valuation of $201,133.90.

One hundred and fifty thousand dollars of this valuation was for the land and buildings, etc. There were 1,917 acres, of which 1,400 were in cultivation. The buildings, etc., consisted of a sugar factory, and all buildings usual on so large a plantation. Whether these were appraised too high or too low it is not possible to say. The movables by destination on the place, the list of which fills 15 pages of the transcript, appear to have been appraised very low. For instance the 67 mules were appraised at $11,725, or an average of $175, whereas the testimony shows they were worth $350. The railroad was appraised at $15,190. It consisted of 7.07 miles of track, two locomotives, 99 cane cars in good order and 7 in bad order, and all necessary tools and supplies, etc. Sugar plantations, however, were at that time practically unsalable, owing to the low price of sugar and the probability of the Wilson administration then going into power being adverse to a tariff on sugar; and Jacob, Sr., president of the company, had proposed to the mortgage creditors, J. B. Levert & Co., that they take the plantation and pay the debts of the company, which with the mortgage amounted to about $100,000, and Levert & Co. had declined the proposition.

When the company thus went into the hands of a receiver it became necessary, in order to induce these mortgage creditors not to foreclose their mortgage, to enter into an agreement with them that the receiver's certificates should not prime their mortgage as debts privileged upon the property of the company. This agreement was entered into on March 22, 1914. Under these circumstances, however, Le Bourgeois & Bush, who had undertaken to make advances to the Jacobs, and had been willing to continue with the receivership, now refused to go on, notwithstanding the representation made to them that the receivership was altogether a consensual or friendly affair. It became necessary, therefore, for the Jacobs to procure funds elsewhere for operating the place. This they succeeded in doing only by selling a piece of property they had in the city of New Orleans. The amount thus realized. $10,000,' proved sufficient.

Ordinarily a very much larger amount than this was required for operating the place; but in 1913 the Jacobs, desirous of getting out of the crop of that year as much money as possible with which to meet their obligations, had not reserved any cane for spring planting, but had ground up the cane which would otherwise have been reserved as usual for that purpose. They had planted in the fall only 95 acres; and because of the smallness of the cane crop the factory on the place was not operated. The cane of that year was sold.

The result of the year's operations, while not brilliant, was encouraging. The expenses of the year, the taxes, the court costs of the receivership, a pressing judgment for $1,800, the receiver's fee of $1,500, and his attorneys' fee of $1,500, were paid. On one of the mortgage notes the past-due interest was paid up to January, 1915, and on the others up to January, 1914, aggregating $5,223.-95. There was planted 315 acres in cane for the ensuing crop of 1915; and there was left in the hands of the receiver a balance of $551.82.

Towards the end of the year 1914 the question of financing the plantation for the year 1915 came up. And a meeting was had in the offices of Guion, Lambremont & Hebert in New Orleans to consider that question. At that meeting were present the two Jacobs, Sr., and Jr., the receiver, and Messrs. Guion and Lambremont. The date of this meeting is not fixed in the record; but it was prior to the 5th of January, 1915.

What was said by Jacob, Sr., at this meeting, is the first point of disagreement in the testimony. Messrs. Guion and Lambremont and the receiver testify that Jacob, Sr., said that he would not risk the money of his children in advances for the year 1915, as he had no confidence in the future of sugar; that rather than do so he would let the plantation go. Jacob, Jr., testifies that his father said nothing of the kind, and he assigns as reasons why his father could not have done so that, to begin with, the Jacob family did not have the money to make the advances with, even if willing and desirous of making them; that all they had was the $10,000 which they had advanced for the crop of 1914, out of which they had lived in that year, so that there was only $75 left, whereas the amount required was some $35,000 to $40,000, as the crop was to be very much larger than in 1914 and the factory was to be operated; and that, owing to the war in Europe, the price of sugar had risen to a paying basis, and the value of sugar property had greatly increased from what it was at the end of 1913 and beginning of 1914; and that it is utterly improbable that his father, who in the beginning of 1914, when the sugar situation had reached its lowest depth, was willing to risk the all of the family for saving the plantation, would have been unwilling to do the same

thing at the beginning of 1915, when the large area of plant cane afforded a much better chance of success, and the prospect was bright and most promising, owing to the rise in the price of sugar. He added:

"I have got quite a number of letters from my father at that time, speaking in very optimistic way of the sugar industry and of the prospects; but not so in 1914."

Jacob, Sr., did not testify, having died five years before the trial, two days after signing the contract now sought to be annulled. Jacob, Jr., says that Messrs. Guion, Lambremont, and Reynaud are mistaken in saying that the said statements attributed to his father were made at the meeting at the beginning of 1915; that it was at the meeting held by the same parties in the same office for considering the procuring of advances for the year 1914. The three gentlemen are positive, however, that it was at the meeting of 1915. Be this as it may, at this meeting in January, 1915, no conclusion was reached as to how the advances for 1915 were to be procured.

Mr. Lambremont testifies that on the train, returning from the meeting to the parish of St. James, he told Mr. Reynaud of the conversations he had had with Jacob, Jr., in which the latter had asked him to get Reynaud interested in financing the plantation, and that Reynaud then told him that he would be willing to furnish the money necessary for running the plantation in the years 1915 and 1916, without charging any interest and looking to the crop alone for his security, provided one-half of the stock of the company was given him.

Jacob, Jr., was overseer on the plantation, under his father, and during the receivership, under the receiver. He furnished his services free of charge with a view to helping out the situation. He says that in December, 1914, when the question of the advances for 1915 came up, he informed Mr. Reynaud that it would be impossible for his family to make the advance, as they did not have the money; that later Mr. Lambremont came to the plantation with Mr. Reynaud—

"and suggested a plan by which the advances could be made for the year 1915, and for 1916 also. * * * The proposition was made that the Uncle Sam plantation and the St. Michael plantation, about a mile and a quarter above the Uncle Sam should be worked in rice; and Mr. Reynaud, in consideration of his making the advances on those two places for two years, was to be given over one-half of the stock of the corporation. He was to fit up the factory and put it in shape in order to handle as large a tonnage as a factory of that character could handle, and was to encourage the cane growers in the neighborhood to plant cane, and to generally make a big undertaking of the affair. Mr. Reynaud asked me what I thought of it, and I told him I would have to submit it to my father and see what he could do about it. My father, of course—

"Q. Well, for doing this, and making the advances to the corporation, he was—

"A. He was to get one-half of the stock, according to his plan, one-half of the stock of the corporation.

"Q. I understood you to say just now that both the Uncle Sam and the St. Michael plantations were to be worked in rice?

"A. The St. Michael was to be worked in rice. I think that is what I said.

"Q. You may have meant to say that, but I got the impression that both the Uncle Sam and St. Michael were to be put in rice.

"A. Oh, no, the Uncle Sam plantation was to be put in sugar; it was to be operated as a sugar plantation, and St. Michael was to be put in rice.

"Q. Did you accept that proposition when it was made to you?

"A. I did not; no, sir.

"Q. What answer did you give at that time?

"A. I told them I would have to submit the proposition to my father for his consideration. I did talk to my father about it. Of course, he thought it was a—

"Mr. Guion: 'Don't tell what he thought, because he is not here to testify for himself. I shall object to your testifying as to any statement your father made.

"Mr. Wortham: Well, leave it out.

"The Court: Well, gentlemen, there is no objection to him saying whether his father agreed to the proposition or not. I want to know that.

"Q. Mr. Wortham: Did your father agree to the proposition?

"A. No, sir; he told them it was a terrible sacrifice, and that it was simply impossible—that he would want to see that proposition in writing, and see just exactly what it was, as he found it impossible to believe that for that consideration a person would want to take over one-half of the corporation. He wanted to see into it, as he could not believe it was possible 'that such a proposition was made me.

"Q. Well, was this offer repeated?

"A. It was repeated perhaps a dozen times.

"Q. By whom?'

"A. By Mr. Lambremont.

"Q. The proposition was made you by Mr. Lambremont?

"A. Yes, sir; and by Mr. Reynaud, but it was spoken of often afterwards by Mr. Lambremont and me.

"Q. Well, tell us what took place at these conferences with Mr. Lambremont.

"A. Well, nothing was done—absolutely nothing—for quite a while. He continued, and we kept on asking for a copy of the plan so as to send it there, but it never was presented for consideration in writing. It was—

"Q. Well, did you finally accept it?

"A. Yes, sir; on the 31st day of December, 1914, Mr. Lambremont called me at his office, and on that occasion asked me if we had made up our minds to accept the proposition. I told him no, that we had not done anything yet, and that we could not see our way clear to do it; and after a long conversation that lasted quite a while he read me a letter, with the signature of F. Reynaud to it, to the effect that he [Mr. Reynaud] would not continue to make the advances on the Uncle Sam plantation if we did not accept—if we did not accept his plan to operate the Uncle Sam plantation for the years 1915 and 1916. He read me that letter in his office, and after laying the letter aside stated to me emphatically and positively that Mr. Levert would not renew the mortgage notes for another year if we did not work under the same administration as the year before; that is, the year 1914. Now, that was on the 31st day of December, 1914, the last of the year. I might add, if I am permitted to continue this answer, that Mr. Lambremont on that occasion strongly advised me, for the interest of myself and my sisters, to accept the proposition.

"Q. Mr. Jacob, did you see that letter from Mr. Reynaud?

"A. Well, all I can do is to illustrate under what conditions the letter was read to me. I was sitting at Mr. Lambremont's left and he held the letter and was reading the letter—he held the letter in his hand, reading it, and said it was from Mr. F. Reynaud. I did not see Mr. Reynaud's signature to it, nor did I see the letter, except the paper which he held up reading to me.

"Q. You did not read the writing yourself?

"A. No, he didn't hold it in such position so that I could see it, and, of course, I did not try to read it, as it was not offered to me to read.

"Q. Well, did you give your consent to that proposition on that occasion, Mr. Jacob?

"A. Yes; I consented.

"Q. Was that consent for yourself or for your company?

"A. Yes; it was given for myself and my people, my sisters and my father.

"Q. Had they authorized you to act for them?

"A. Yes, sir, they had authorized me to act for them if it became necessary to do so, and I considered, after what he had said to me, that I had no alternative but to follow his advice, and I accepted it under those conditions.

"Q. Now, when was this—first, was this proposition ever reduced to writing?

"A. The first time my father or myself ever saw the proposition in writing, and, for that matter, my sisters, or anybody connected with our family, was on the fifth of January.

"Q. Of what year?

"A. January 5, 1915.

"Q. Where was that?

"A. That was on the Uncle Sam plantation, in the office of the company there, when Mr. Lambremont came with the resolution, which was inscribed, at his directions and orders, in the minute book of the corporation, and signed by the proper officials.

"Q. Who was present at that meeting on January 5?

"A. On the 5th of January, why, the board of directors.

"Q. Please name them?

"A. My father, myself and my sister.

"Q. Who else was present?

"A. Mr. Lambremont was present.

"Q. And who else?

"A. You mean on the 5th of January?

"Q. Yes; if there was nobody else present, just say so.

"A. Well, I am trying to recollect who all was there. I don't remember of anybody else being present except those I named. It is possible that there was some one else present, but I do not remember it at this time.

"Q. Was there any resolution passed by the board of directors on that date?

"A. Yes, sir; there was a resolution passed on the 5th of January to transfer one-half of the stock of the corporation in consideration of these advances.

"Q. One-half of the stock of what?

"A. Of the corporation.

"Q. Transfer it to who?

"A. To Mr. F. Reynaud."

(In connection with the testimony of the witness, counsel for the plaintiffs offers, produces, and files in evidence certified copy of a resolution passed by the board of directors of the Uncle Sam Planting & Manufacturing Company on January 5, 1915, marked "P–13.")

"Q. Now, Mr. Jacob, who offered that resolution that has just been filed in evidence here?

"A. It was offered by Mr. Lambremont.

"Q. Was Mr. Lambremont a member of the board of directors?

"Mr. Guion: I shall object to that unless the minute book is produced, as being the best evidence of what happened on the occasion referred to, or until its disappearance is accounted for.

"The Court: The objection is sustained. There is no question but what the minute book is the best evidence of what transpired. The court is not trying the firm of Guion, Lambremont & Hebert, nor any of the individual members of that firm. It is engaged in a proceeding to determine the ownership of this stock.

"Mr. Howell: This evidence is being offered for the purpose of showing that the firm of Guion, Lambremont & Hebert were the legal advisers of Mr. Reynaud, the receiver; the stockholders of the Uncle Sam Planting & Manufacturing Company, and the Jacob family, who owned the property prior to its being taken over by the corporate organization. It is not offered for the purpose of showing that a formal resolution was offered, as written in the minutes of the corporation, but for the purpose of showing that the resolution in question was prepared by Mr. Lambremont, a member of the firm of Guion, Lambremont & Hebert, acting as the adviser of the stockholders of the Uncle Sam Planting & Manufacturing Company, and as their attorney, and for the further purpose of showing that the resolution was passed at his instance, and under his advice as counsel and attorney for the stockholders. It is not with any idea at all of contradicting the minutes nor any of the records of the corporation or the transactions of the board of directors, and for that pur-

pose I believe it is certainly competent evidence.

"The Court: The objection is sustained."

(To this ruling of the court counsel for the plaintiffs excepts and reserves this note in lieu of a formal bill of exceptions.)

"Q. Mr. Wortham: I believe, Mr. Jacob, you have already stated that none of you had seen that resolution before it was offered?

"A. Yes, sir; I have stated that. The first time I ever saw it was on the 5th of January, 1915.

"Q. Well, what about the contract that was entered into in pursuance of this resolution, Mr. Jacob? When did you see that?

"A. The contract to carry out the resolution I saw on the 6th day of January, 1915—on the day that it was signed in the city of New Orleans. My father signed the document in his bedroom, where he was very sick. In fact, he signed it on his deathbed, as he died two days later.

"Q. Was your father present at this meeting on the plantation on the 5th of January?

"A. Yes, sir; he was present, having left a sickbed to attend the meeting.

"Q. Where was his sick room?

"A. In the city of New Orleans.

"Q. On what day of the month did your father die?

"A. On the 8th day of January, 1915.

"Mr. Howell: How long had he been confined to his bed?

"A. He had been sick for some two or three months before that; and for just about a week before going to the plantation on the 5th of January he had been very, very ill; and he was advised very strongly by his physician not to attempt to make this trip to the plantation."

In his testimony in another case, the transcript of which has been made part of the transcript in this case, Mr. Lambremont denied that he read to Mr. Jacob a letter from Mr. Reynaud as here testified by Jacob; in fact, denied that the interview at which Jacob says this letter was read ever took place.

It may be well to reproduce here the said resolution of the board of directors of the company:

"Whereas the Uncle Sam Planting & Manufacturing Company is unable to obtain advances, in money and necessary supplies, for

carrying and operating the Uncle Sam Plantation during the current year 1915, and will be unable to obtain such necessary advances for the year 1916;

"Whereas L. B. Levert and J. B. Levert Company, Limited, in liquidation, have consented not to enforce their mortgage upon the Uncle Sam Plantation, provided the same be operated and carried on under the management, supervision and control of Firmin Reynaud, the present receiver of the Uncle Sam Planting & Manufacturing Company;

"Whereas, said Reynaud has agreed to make all ·of the advances in money and necessary supplies to cultivate, carry on and operate said plantation during the years 1915 and 1916, without making any charge whatever, by way of interest or otherwise, except as herein provided, for making said advances during the said two years, provided said plantation be not seized by the aforenamed mortgage creditors, or sold under an order of court before the expiration of the year 1916, on condition that as a consideration for his making said advances, he do have transferred to him, in full ownership, by the Uncle Sam Planting & Manufacturing Company and by the individual stockholders thereof, one-half of the authorized capital stock of said corporation; and

"Whereas it is to the interest of said corporation and the individual stockholders thereof that such an agreement should be made and entered into by them with said Reynaud of the following tenor, and on the following terms and conditions, as follows, to wit:

### "Article I.

"The Uncle Sam Planting & Manufacturing Company a corporation chartered under the laws of the state of Louisiana, and having its domicile in the parish of St. James, in said state, and Jules J. Jacob, Sr., Jules J. Jacob, Jr., Marie Jacob, Mrs. Edith Jacob, wife of Denis J. Jumonville, the present stockholders of said corporation do hereby transfer to Firmin Reynaud of Lutcher, Louisiana, one-half (½) of its authorized capital stock of one hundred and fifty thousand dollars ($150,000.-00) at par.

### "Article II.

"In payment for said stock, which is hereby acknowledged, Firmin Reynaud binds and obligates himself to advance to said Uncle Sam Planting & Manufacturing Company all moneys and supplies without interest, necessary to plant, cultivate, harvest and dispose of the crops to be grown on the Uncle Sam Planta-

tion, the property of said corporation, situated in the parish of St. James, state of Louisiana, for the years 1915 and 1916, provided said plantation is not, in the meantime, seized by mortgage creditors or ordered sold at the instance of ordinary creditors, in which event the obligation of said Firmin Reynaud to make said advances shall cease and terminate, without in any manner, however, affecting his lien and privilege on all crops grown on said Uncle Sam plantation for advances made up to the time of said seizure, or order of sale, which crop lien and privilege is hereinafter provided for in the articles of agreement, and it shall be optional with said Firmin Reynaud to decide whether or not he shall renew his obligation to advance moneys and supplies, to said' Uncle Sam Planting & Manufacturing Company, for the unexpired period of this agreement, for the purpose above stated, should a compromise be effected with said seizing mortgage or ordinary creditors of the said Uncle Sam Planting & Manufacturing Company in a manner satisfactory to him, or in the event the receiver of said corporation should be discontinued and the Uncle Sam plantation ordered sold to pay debts.

### "Article III.

"The moneys and supplies to be advanced, as aforesaid, by said Firmin Reynaud to said Uncle Sam Planting & Manufacturing Company, for the purposes aforesaid, shall be secured by a lien and privilege on all the crops to be grown on said Uncle Sam plantation and to be granted and given for each of the years 1915 and 1916.

"Said advance to be made, to be paid by preference over all other debts of said Uncle Sam Planting & Manufacturing Company, out of the proceeds of the crop of said years of 1915 and 1916.

### "Article IV.

"Firmin Reynaud, is to have exclusive and entire management and control of all the business of the Uncle Sam Plantation & Manufacturing Company, as regards the Uncle Sam plantation and appurtenances, during the years 1915 and 1916, as completely as though he were the owner of said plantation and appurtenances, without, however, the right of placing any incumbrances on said plantation, or contracting any new debts which might, in any manner, create an incumbrance on said plantation or said appurtenances, or rendering said Uncle Sam Planting & Manufacturing Company liable, in any manner, for said debts.

"Article V.

"The Uncle Sam Planting & Manufacturing Company reserves the right and privilege of purchasing from said Firmin Reynaud, at par, the seventy-five thousand dollars ($75,000.00) of stock, representing one-half (½) of the authorized capital stock of the Uncle Sam Planting & Manufacturing Company, and Firmin Reynaud agrees to surrender said stock to said company, at any time from January 15, 1915, to January 17, 1917, on the said Uncle Sam Planting & Manufacturing Company giving to said Firmin Reynaud, in consideration of the retransfer of said seventy-five thousand dollars ($75,000.00) of stock, at par, to said Uncle Sam Planting & Manufacturing Company, first mortgage on the Uncle Sam plantation the property of said company, said mortgage to contain all the necessary clauses to give it first rank and full security.

"Article VI.

"It is well agreed and understood, by and between the parties to these articles of agreement, that no dividends are to be declared by the Uncle Sam Planting & Manufacturing Company, during the period of the existence of this agreement, unless the entire indebtedness now due or owing by said Uncle Sam Planting & Manufacturing Company has been liquidated in full, or unless by mutual agreement of all parties hereto, the entire debt owing or due by said Uncle Sam Planting & Manufacturing Company, has been satisfactorily adjusted.

"It being the intent and purpose of this agreement to cultivate the Uncle Sam plantation during the years 1915 and 1916, for purpose of realizing money to liquidate all of the outstanding indebtedness, or as much as possible thereof, of the Uncle Sam Planting & Manufacturing Company, due on the Uncle Sam plantation, and to apply all net proceeds, from all crops thereon cultivated during said two years aforesaid, to that purpose and that purpose alone.

"Now, therefore, in order to carry out said agreement which is hereby authorized and which the president of said corporation is hereby authorized and directed to sign for and in the name of said Uncle Sam Planting & Manufacturing Company, along with the stockholders of said corporation and said Firmin Reynaud.

"It is hereby resolved that the full amount of the authorized issue of the capital stock of the said Uncle Sam Planting & Manufacturing Company, to wit, the sum of one hundred and fifty thousand dollars ($150,000.00), be, and the same is hereby ordered to be issued, the certificates for the same to be signed in the same manner as the certificates now outstanding are signed.

"That there be issued to Firmin Reynaud stock to the amount of seventy-five thousand dollars¹ ($75,000.00), and that the balance of said authorized issue of stock be issued to the present stockholders of said corporation, in the proportion in which they now hold stock therein, on their surrendering the certificates of stock now held by them, as stockholders of said corporation, which it is the object and purpose of this resolution that they should do, in order to carry out the aforesaid agreement, the whole in conformity with and according to the terms of the contract which by this resolution, the Uncle Sam Planting & Manufacturing Company, and the stockholders thereof, are to enter into with said Firmin Reynaud, as hereinabove fully detailed and set forth."

The proposition of this resolution was carried out by a formal notarial act executed on the next day, January 6, 1915, in New Orleans, by which $75,000 of the capital stock of the company was transferred to the receiver. As the contract merely carries out the proposition of the resolution, reproducing its recitals, its transcription here is not necessary.

Much acrimony has grown up in this case between the parties and to some extent between counsel, as the result of an effort made by counsel for plaintiff to impugn the good faith of Mr. Lambremont in his relations with plaintiff, accusing him of having lent his aid to the receiver in the effort of the latter to profit at the expense of the Jacob family.

[1] We find no necessity for going into all that for disposing of the case. Of the perfect good faith and sincerity of Mr. Lambremont from beginning to the end of the transaction we have no doubt whatever. When advising Jacob, Jr., in his office, to have recourse to a friendly receivership, he was unquestionably acting merely as a friend. He and Jacob, Jr., had been school-

JACOB v. REYNAUD

mates. While, in applying for the receivership, he necessarily was acting as the legal adviser and attorney of the Jacob family, since Miss Adele Jacob was merely lending her name to that family for helping them out in their trouble, he was not doing it with any idea of receiving any payment from them for his services, but, naturally, in the expectation that his firm would be the attorneys of the receivership, which was sure to result from the application, since it was a consensual or friendly proceeding. After his firm had been duly appointed the attorneys of the receivership his acts and those of his law partner Judge Guion were strictly in line of this professional employment. The receivership, however, being a friendly one, resorted to for rescuing the Jacobs from their financial difficulties, the line of demarcation between the acts of these attorneys as legal advisers and attorneys of the receivership and of the Jacob family was a very shadowy or nonexistent one. The interests of both were exactly the same. This lasted until the proposition of the receiver to have one-half of the stock of the company transferred to him came up. / The interests of the receiver and those of the receivership and the Jacobs then became antagonistic, however much Mr. Lambremont may have thought that under the circumstances there could be only one course to follow, and that therefore there was no antagonism. The Jacobs were depending on him for legal advice. The effort made by defendant to show that Mr. Louque was at that time the legal adviser of the Jacob family in connection with the receivership has failed utterly. For one thing the Jacobs were not advised that any certificates the receiver might issue could not possibly prime the claim of J. B. Levert & Co., as that claim was secured by vendor's privilege, and as by Act 199, p. 381, of 1914 receiver's certificates are subordinate to the vendor's privilege. The debt due to Levert & Co., had been assumed by the company as part of the purchase price of the plantation, and was therefore secured by vendor's privilege. Scionneaux v. Waguespack, 32 La. Ann. 283; De L'Isle v. Moss, 34 La. Ann. 164; Breaux v. Sarvoie, 39 La. Ann. 245, 1 South. 614; Citizens' Bank v. Cuny, 38 La. Ann. 360; People's Bank v. Ice Co., 142 La. 808, 77 South. 636. The information as to this condition of the law would have been valuable to the Jacobs in dealing with Levert & Co., as they could by means of it have dispelled the apprehension of that company that their claim might be endangered by the issuance of receiver's certificates priming it.

In March, 1915, Firmin Reynaud was elected a director of the company, and Jules Jacob, Jr., was elected president.

The St. Michael plantation, which Jacob, Jr., says in his testimony was to be cultivated in rice, belonged to Miss Adele Jacob. It was situated in the neighborhood of the Uncle Sam plantation. Miss Adele Jacob was asked:

"Do you remember leasing that place in the year 1915?" And she answered: "Yes, sir: I made a lease to Grangnard & Reynaud for rice. Now, they said they were going to rent it to help out Uncle Sam; because I asked them: 'Isn't Uncle Sam going to rent the place?' and they said no; they will rent it for them. Q. They told you they were going to rent it for Uncle Sam? A. Yes, sir."

The accounts of the St. Michael plantation were kept by the bookkeeper of the Uncle Sam, and the place was worked with the mules, etc., of the Uncle Sam. The money with which to do the work was furnished, however, by the partnership of Grangnard & Reynaud until the lease was transferred to the company. Grangnard was a close friend of Reynaud. They owned plantations in partnership. The date of this St. Michael lease is not given; but on the 10th of February, 1915, the receiver applied to the court for authority to sublease the plantation, or,

in other words, to allow the lease to be transferred to the Uncle Sam Company. There had then been spent $7,120.05 which was at once paid to Grangnard & Reynaud by the Uncle Sam Company.

The operations of the years 1915 and 1916, including the St. Michael plantation, were successful. There was realized in 1915 a net balance of $17,424.80. Out of this there was paid $10,818.30 to the mortgage creditor, $400 to the attorneys, and $1,000 to the receiver; leaving a balance of $5,206.50. There was realized in 1916 a net balance of $47,675.74. Out of this was paid $1,200 to the receiver, $1,900 to the lawyers, and a balance of $44,-743.46 was proposed to be used in the payment of the federal income tax and in reduction of the mortgage debt.

In January, 1917, the receiver filed his final account, and asked to be allowed to return the plantation to the president of the company, as there was no further necessity for a receivership. Opposition was made to the account by the present plaintiffs, who made then the same contention as now as to the nullity of said transfer of stock, but were relegated by this court (144 La. 1006, 81 South. 604, supra) to a direct action, which is the present suit.

[2] Any purchase made by a judicial fiduciary of the property in his charge is stricken by our law with nullity, with certain exceptions of which the purchase of the stock in the present case is not an example. C. C. arts. 1146, 1790.

And that rule is not peculiar to our Code. 23 R. C. L. 77, 78; 34 Cyc. 255.

The theory of the rule is stated with great force and simplicity of language by the Master of the Rolls, in Nugent v. Nugent, [1908] 1 Ch. 546, 1 British Ann. Cases, 412, 14 Ann. Cas. 76, as follows:

"First of all, it is important to remember that the court, in dealing with this class of cases, does not proceed upon the footing that there has been fraud or improper conceal-

ment, or any special advantage taken by the receiver; but it proceeds upon the general rule that in cases of this kind the purchase ought not to be allowed at all, because it is a dangerous thing to allow, as in most cases it is impossible to ascertain whether the receiver has or has not taken undue advantage of his position."

In that case a mortgage creditor had foreclosed his mortgage on a house belonging to the receivership, and the receiver had become the adjudicatee at the foreclosure sale. In the course of the opinion the Master of the Rolls said:

"It is said, and there is a great deal of plausibility in the argument, that this, after all, was merely a house in Hove about which there could be no special knowledge. I think we ought to decline to go into that, because when once we arrive at this point, that the doctrine of the court does not depend on the fact of undue knowledge, but merely on the probability of it, and that the man is in a position where his duty and interest are in conflict, we ought not to consider whether under the special circumstances of the particular property, there is any great probability of fraud."

The following is from 23 R. C. L. 7:

"A receiver is merely a ministerial officer of the court, or, as he is sometimes called, the hand or arm of the court. * * * His acts and possession are the acts and possession of the court. * * * Notwithstanding this rule as to the agency of a receiver, it is frequently said that the receiver of an insolvent corporation represents not only the corporation, but also the stockholders and creditors, and it is his duty to assert and protect the rights of each of these several classes of persons. * * * He is a trustee for both creditors and shareholders."

In the case of In re Receivership of the New Iberia Cotton Mill Co., 109 La. 878, 33 South. 904, this court said:

"Property in the hands of a receiver is property in the custody of the law."

In Porter v. Sabin, 149 U. S. 479, 13 Sup. Ct. 1010, 37 L. Ed. 818, the court said:

"When a court exercising jurisdiction in equity appoints a receiver of all the property

of a corporation, the court assumes the administration of the estate; the possession of the receiver is the possession of the court; and the court itself holds and administers the estate, through the receiver as its officer, for the benefit of those whom the court shall ultimately adjudge to be entitled to it."

From 23 R. C. L. 46:

"The appointment of a receiver for a corporation is a suspension of its functions and authority over its property and effects, and is equivalent to an injunction to restrain its agents and officers from intermeddling with its own property in any way. In effect the receiver succeeds to all the rights of the corporation and the authority to control its property."

This purchase by the receiver of the property in his charge was therefore a nullity.

Defendant says that this stock did not belong to the corporation, but to the stockholders. As a matter of fact, 680 of the 750 shares had never been issued; and therefore belonged to the corporation; was treasury stock. Apart from this, the stock of a corporation represents its property; and hence to say that defendant by acquiring the stock did not acquire the property, is mere quibbling. Moreover, the defendant was trustee for the stockholders as well as for the corporation itself; and hence the sale was null even as to the 70 shares which belonged to the stockholders.

Between the sale of these 70 shares belonging to the stockholders and the sale of the 680 shares belonging to the corporation there is this difference: That as to the former there was a contract, whereas as to the latter there was no contract. There was no contract as to the 680 shares belonging to the corporation because in order that there should be a contract there must be the meeting of two minds; and for the sale of these 680 shares belonging to the corporation there was not a meeting of two minds. There was but the one mind of the receiver acting. He sold to himself. True,

he was acting in two capacities, individually, and as receiver; but there was only one mind acting; and for the existence of a contract there must be the action of two minds. C. C. arts. 1798, 1765. As to these 680 shares there was therefore no contract.

[3] The action of the board of directors in going through the forms of holding a meeting and resolving to enter into the contract for the corporation amounted in law to nothing at all, was a mere empty formality producing no legal result whatever, since, as has been seen from the law hereinabove quoted, all the powers of the corporation had been withdrawn by the court from the officers of the corporation and vested in the receiver, so that the receiver alone had any power to act for the corporation. The officers therefore had no power in the premises.

Between a private sale by a receiver to himself, such as this, and an adjudication to the receiver at a judicial sale made under orders of the court, there is this difference, that the latter sale is made by order of the court, and in law the owners have consented through the agency of the court, or in other words, the court has consented for them. When a debtor's property is seized and sold, the sale though in fact against his consent is in law with his consent; the order of the court standing in lieu of his consent. But for a private sale the owner himself must consent; else there can be no consent and no sale.

While a corporation is not dissolved by the appointment of a receiver, and ex necessitate certain powers may remain in the officers, such, for instance, as the power to sue and to defend suit, certainly the power to dispose of the property of the corporation by private sale is totally taken away from the officers of the corporation and vested in the receiver. The order of the court in the present case was to that effect.

As to the 680 shares there was no sale. As

to the other 70 shares there was a sale, but one that was null in the sense of being annullable at the suit of the stockholders.

Inasmuch, however, as the corporation was owned by the Jacobs, and the arrangement such as it was could not affect the creditors prejudicially, but only beneficially, so that there could then have been, as there is now, no complaint on the part of creditors, the distinction here made between nullity in the sense of nonexistence and nullity in the sense of annullability is one which can be of importance only from the standpoint of ratification; the sale merely annullable being susceptible of ratification, and the other not.

Defendant pleads ratification; but the person who is to ratify an illegality must necessarily first know of its existence, and there is no good reason for not believing Jacob, Jr., when he testifies positively that he did not know of the illegality of this transfer of stock to defendant. He had heard Mr. Louque express an opinion to that effect; but the attorneys of the receivership, Messrs. Guion, Lambremont & Hebert, were of a different opinion, and had given more thought to the matter than Mr. Louque, whose opinion was given offhand. The receivership being a friendly one, supposedly in the interest solely of the Jacobs, there was every reason why Jacob, Jr., should have full confidence in the advice of the attorneys of the receivership. It seems that Jacob, Jr., and defendant went to the office of Mr. Louque with Judge Guion and Mr. Lambremont to consult with him; he having been a friend of the Jacob family and more or less their legal adviser. The parties differ as to whether the consultation was to be over this matter, or the matter of the transfer of the lease of the St. Michael plantation. At any rate this matter was discussed, and Mr. Louque was of opinion that the contract was illegal; but, on his being told that the parties

had already entered into it and a resolution to that effect had already been adopted by the board, "Well, there is nothing to be done if it is already signed," meaning that there was nothing to do but go on. And, again, ratification must be voluntary; whereas in the present case the Jacobs were never in a position to act from their free will in the matter, and hence cannot be said to have ever ratified anything. The facts in that connection will appear in the course of the discussion of the plea of estoppel, to which we now come, and need not be gone into separately.

The estoppel, it is said, "is founded on the fundamental principle that every person who makes a transfer or conveyance of property is bound to warrant his transferee in the ownership as well as the quiet and undisturbed possession of the property transferred."

The learned counsel for plaintiff justly observe that this is saying no more than that a person is bound by his contract, and that it is therefore a mere begging of the question, since the question is as to the existence and validity of the contract.

The estoppel is said to be founded also upon the fact that the Jacobs voted to make defendant a director of the company, and in fact elected him vice president.

We fail entirely to see the force of this argument. After defendant had secured control individually of one-half of the stock of the corporation, and in addition had the complete control of the corporation affairs in his hands as receiver, he had the Jacobs pretty much at his mercy, and what they did in order to save themselves from utter ruin can hardly serve as a basis for any equitable plea in favor of defendant against them.

The only ground for the estoppel that can have any semblance of solidity is in the contention that the Jacobs voluntarily took advantage of the arrangement, and have profit-

JACOB v. REYNAUD

ed largely by it—in fact, were saved from ruin by it, and now, after they have been made safe as the result of it, are seeking to repudiate it.

[4] A fiduciary, who at the end of the first year of his administration turns up as owner of an entire half of the property intrusted to his administration, must make out a very strong case indeed for maintaining his title, in the face of article 1146 of the Code, which "forbids" and "prohibits" fiduciaries from acquiring the property intrusted to their administration. And the burden thus resting upon him becomes heavy when, as in the present case, the prospect of the property confided to him being valuable, had brightened between the time of his taking charge and the time of his acquisition. As to the latter fact there can be no doubt whatever. As an effect of the war in Europe the price of sugar rose in 1914, and, naturally, this boosted the value of sugar plantations.

One reason assigned for the maintenance of the title is that what the defendant gave to the company as the consideration of the transfer was a full equivalent of what he received. What was thus given is detailed in defendant's answer as follows:

| | | |
|---|---|---|
| (1) | Interest on advances for 1915.......... $ | 774 27 |
| (2) | Commissions for the year 1915......... | 783 53 |
| (3) | Interest on advances for 1916.......... | 831 29 |
| (4) | Commissions for the year 1916.......... | 2,061 92 |
| (5) | Profits on the rice crop made on St. Michael Pltn. in year 1915......... | 10,665 60 |
| (6) | Profits on the rice crop made on St. Michael Pltn. in year 1916.......... | 7,491 31 |
| (8) | Value of one engine, one pump, one siphon, one rice thresher, one hay-press and other implements bought for the St. Michael plantation...... | 3,295 23 |
| (9) | Additional compensation as receiver... | 3,000 00 |
| (10) | Benefit to Uncle Sam from grinding the crop of 1916 at the Terra Haute factory ............................... | 8,714 93 |
| | Total ..................................... | $37,978 08 |

[5] The interest in item 1 is charged at 8 per cent., whereas the law, in the absence of express agreement (and there was none in this case) allows only 5 per cent. Plaintiffs seek to make a point of this; but the question is not as to what rate of interest the defendant may charge, but as to what was the value of his money and what was the value to the company of the risk he was taking in advancing the money. The money was worth full 8 per cent., for that was the rate which money commanded in such a case.

[6] The commissions in item 2 could not be charged in an account between the parties, as, if charged, they would constitute usury. Kent v. Mojoiner, 36 La. Ann. 262; Succession of Rhoton, 34 La. Ann. 895.

The same may be said of items 3 and 4.

The rice crop on St. Michael plantation belonged to the Uncle Sam Company.

The item 7, work of mules, is said in the brief of plaintiffs to have been offset by the loan of an engine. We have not taken the trouble to investigate the matter.

The movables mentioned in item 8 were paid for by the company.

The additional compensation mentioned in item 9 would probably have been allowed the receiver if charged in his account, but it was not mentioned, then, and appears to come up now as an afterthought.

[7] The charge of $8,714.93, constituting item 10, is supposed to represent the difference between what would have been the regular charge of the Terre Haute factory belonging to Grangnard & Reynaud for grinding such a crop of cane as that of Uncle Sam plantation in the year 1916, and the charge that was actually made to that plantation for grinding its crop of that year. Suffice it to say of that item that the cane was ground in pursuance of a regular contract, and that if this was a liberal contract to the Uncle Sam plantation (a thing which plaintiffs do not admit), the receiver in securing it did no more than what was his duty.

As a matter of fact, the only consideration the defendant parted with in this contract was the value of the use of the money which he advanced and the risk which he incurred. All else, save perhaps the $360 for use of

the mules of Grangnard & Reynaud, and the difference between the amount of the commission to which he might have been entitled as receiver and the amount which he actually charged, was nothing more than the performance of a duty which he owed as receiver, an extrazealous performance of duty, no doubt, under the spur of personal interest, but still simply the performance of a duty. And as a matter of fact this furnishing of the money without interest was the sole consideration mentioned in the contract.

Defendant was under no obligation to advance money out of his own pocket. If therefore the situation had been as he seeks to make out it was, that the company was indebted up to the full value of its property, and was without credit, and that therefore without the contract in question the property of the receivership would have had to be sold at public sale, with the certain result that it would have realized less than the amount of the debts, there might be some foundation for the estoppel. But such is very far from having being the situation. Even at the end of 1913 and beginning of 1914, when the sugar situation was at its very lowest state of depression, the Jacobs had succeeded in securing advances. The sole trouble then was that the ordinary creditors might bring on a crisis by pressing for immediate payment. To stay these ordinary creditors was the sole object of the receivership. Defendant does not pretend to have made any effort whatever to secure advances for 1915; and it is simply futile for him to seek to minimize that fact by calling witnesses to testify that at that time the securing of advances for sugar plantations was difficult. Other witnesses equally competent and reliable have testified that at the beginning of 1915 the Uncle Sam Company in the situation in which it was should have encountered no very great difficulty in securing advances. At any rate until the defendant had made a bona fide trial, he could not know what the result of an effort in that direction would be. At the beginning of 1915 the sugar situation had greatly improved. This is undeniable. And, apart from the rise in the value of sugar property, the financial condition of the company had greatly improved, since out of the small crop of 1914 there had been paid the year's expenses, the taxes, the expense of the receivership, $5,223.-95 interest on the mortgage debt, a pressing judgment of $1,800, and there had been planted 315 acres in cane, thereby laying the foundation for a money crop in 1915—an expectation which the work justified—and $501 was on hand for beginning the activities of 1915.

While at the end of 1913 the situation of the company was very precarious, if not almost desperate, it was not so hopeless that the present counsel of defendant did not think it could be bridged over by means of a receivership, nor that the Jacobs were not willing to sell their New Orleans property in order to make an effort in that direction; nor that Le Bourgeois & Bush were not willing to advance their money on the faith of it. That the elder Jacob, sick in body and probably as much so in mind, should have been willing, in a moment of despondency, to throw up the sponge, and let the plantation go for the debts, is by no means the best criterion. But whatever the situation was at the end of 1913, and whatever might have been the view to be taken of this case if the contract in question had been entered into at that time, the situation at the end of 1914 was not such that any sugar planter would have been willing to give one-half of his plantation for securing advances for the crop of 1915; at any rate. not until he had made most desperate efforts and thoroughly exhausted every recourse.

[8] As an excuse for not having made any effort to secure advances from some other quarter than himself, and on the usual terms, instead of at this extravagant price of

one-half of the plantation, defendant insists that at the time he agreed to become receiver it was well understood between him and the Jacobs that the latter would furnish the advances, and he was not to be expected to concern himself about procuring them. Jacob, Jr., denies this, but, granting it to be true, this did not relieve defendant of the duty as receiver to use every endeavor to secure the advances before seeking to impose upon the Jacobs the extraordinary condition of yielding up to him one-half of the property of the receivership.

The record leaves no doubt at all that from the time the company was put in the hands of the receiver, Jacob, Jr., found himself in a position where there was no choice for him but to act as he did, and from the time of the death of his father two days after the signing of the contract in question, he may be said to have been the Jacob family for all the purposes of the affairs of the company, for his sisters at no time took any part in the business. And from the time of the appointment of the receiver the affairs of the company were entirely out of his hands; he was a mere overseer on the plantation under the receiver, whom the receiver might discharge at any moment. He had every reason to believe that there was nothing for him to do but to act according to the counsels of Mr. Lambremont, and these were that if he did not accept the terms proposed by defendant, the mortgage creditor would foreclose at once. In a word, he believed, and was justified in believing, that unless he acted as he did, he would (to use his own expression) be simply "blowed."

[9] Defendant says that the suit is based on lesion beyond moiety, and that therefore no cause of action is shown, since lesion beyond moiety is not a cause of nullity in sales of movables.

The answer to that is that the suit is not based on lesion beyond moiety, but on the nullity resulting from the relation of trust in which the defendant stood towards the property and its owners.

Our conclusion is that the transfer of the stock in question was a nullity, and should be annulled; and that the prayer of plaintiffs' petition, that the defendant be ordered to deliver the certificates of stock in question to the petitioners, and be enjoined from disposing of same, should be granted.

The same conclusion as to the nullity of said transfer of stock was reached by the learned trial judge when that question was before him on the opposition to the final account of the receiver. In the present case he decided differently, on the assumption that on the appeal from his former decision this court had taken a different view. But in so thinking he was mistaken; for the question considered by this court was as to whether the nullity of said transfer could be litigated on an opposition to an account of the receiver, and this court simply decided that a direct action would have to be brought for that purpose. The court reserved the right to bring such direct action, and the present suit is that action.

It is therefore ordered, adjudged, and decreed that the judgment appealed from be set aside; and that the plaintiffs, the Uncle Sam Planting & Manufacturing Company, Jules J. Jacob, Jr., Miss Marie Jacob, and Mrs. Edith Jacob Jumonville have judgment against the defendant Firmin Reynaud, condemning him to transfer to the said plaintiffs the 750 shares of stock transferred to him by written contract of date January 6, 1915, and enjoining the said Firmin Reynaud from disposing otherwise of said certificates of stock; and that the defendant, Firmin Reynaud, pay the costs of this suit.

On Rehearing.

By the WHOLE COURT.

DAWKINS, J. Without going into a further discussion here, we have concluded that

all issues, other than the title to the 70 shares of stock transferred to defendant by the individual stockholders of the Uncle Sam Planting & Mfg. Company, have been properly disposed of in our former opinion and decree in this case. What we shall have to say applies, therefore, to the said 70 shares of stock only.

[10-12] The stock belonging to the individual stockholders was their property, as distinguished from the tangible assets of the corporation; and they were at liberty to sell, transfer, or deal with it as they saw fit. They now seek to interpose, as a defense to what would otherwise unquestionably have been a valid and binding agreement, the alleged incapacity of the transferee (Reynaud) on account of the fact that he was at the time receiver of the corporation with reference to whose stock he and the plaintiffs were dealing as individuals. As we have heretofore said, the transaction, at most, was voidable and not void. Jacob v. Uncle Sam Planting & Mfg. Co., 144 La. 1014, 81 South. 604. Plaintiffs chose to transfer to Reynaud in consideration of his agreement to furnish the financial means for operating the properties of the corporation and his valuable services, based upon long and successful experience in the sugar producing business, the stock now involved, and continued to receive the benefits arising therefrom for more than two years. From a condition of practical insolvency, he, during this time, converted it into a healthy going concern, with a large part of its debts discharged and some forty-odd thousand dollars in cash to be used in continuing operations and to apply upon its mortgage indebtedness.

It is true that during this time, Reynaud bore the technical relation of receiver to the corporation, but Jules J. Jacob, Jr., and the other stockholders knew this, and, notwithstanding the fact that they had also been advised of the limitations imposed upon him as such, continued to reap the reward of his efforts and services. In these circumstances, after such long acquiescence and ratification of the transaction which might otherwise have been avoided, they should not, in equity and good conscience, be permitted to escape the effects of the contract which they, as individuals, had made and which had been performed by the other side. See authorities cited in Jacob v. Uncle Sam Pltg. & Mfg. Co., supra.

For the reasons assigned, our former decree herein is amended so as to exclude from the order condemning defendant to reconvey the 750 shares of the capital stock of defendant corporation transferred by the contract of January 6, 1915, the 70 shares of said stock received thereunder from the individual stockholder or stockholders, as distinguished from that received direct from the corporation, and as to which 70 shares the title of the said Reynaud is recognized and held valid. In all other respects, our said decree is reinstated and made final; defendant to pay all costs.

PROVOSTY, C. J., dissents as to the 70 individual shares.

LAND, J., dissents.

O'NIELL and St. PAUL, JJ., dissent, and think the judgment appealed from should be affirmed.